# Memorandum

**To:**   Carl Field

**From:** Ron Fedor

**Date:** 9/15/01

**Re:**   Final Written Warning

---

As a result of a recent investigation in the Groton McDonald's, it was determined that inappropriate behaviors occurred within the store during your responsibility as acting store manager, while Tim Michaud was on sabbatical.

Carl, you are aware that a McDonald's manager is responsible to follow company policies as well as enforce company policies consistently and fairly. When policies are broken, you are required to resolve the issue or seek help from me if you cannot find a resolution. All comments, jokes and actions are required to be professional, business related and an employee's personal space must not be compromised.

Your feedback is sought after and encouraged. Please be advised that further violations of any company policy may result in disciplinary action up to and including separation of employment from McDonald's Corporation.

Carl Field-Store Manager:_____
          Date:_____

Ron Fedor- Operations Manager:_____
          ,Date:_____



1

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF CONNECTICUT

3

4      _____
                                        )
5      MELISSA BURFORD,                 )
                                        )
6                          Plaintiff,   )
                                        ) CIVIL NO:3:02 CV 1738(DJS)
7                    vs.                )
                                        )
8      MCDONALD'S CORPORATION,          )
                                        )
9                          Defendant.   )
       _____)
10

11

12

13

14           Deposition of CARL K. FIELD, taken pursuant to FRCP

15     Rule 30, at the law offices of Bartinik, Gianacoplos,

16     Bartinik, Bartinik & Grater, P.C., at 100 Fort Hill Road,

17     Groton, Connecticut, before Sarah J. Miner, L.S.R., a Notary

18     Public in and for the State of Connecticut,

19     on May 23, 2003 at 10:10 a.m.

20

21

22

23

24

25

1          A.    Yes.

2          Q.    When he went on sabbatical who then was Melissa

3    Burford's immediate supervisor?

4          A.    Myself.

5          Q.    When he got back from sabbatical he then resumed

6    the position of store manager?

7          A.    Correct.

8          Q.    But at that time you were also store manager,

9    right?

10         A.    Yes.

11         Q.    At that time were you both equal authority or

12   was he more authority or you more authority?  Can you explain

13   the relationship?

14         A.    When he returned from sabbatical, I went over

15   the issues of the store, addressed the issues that were

16   obviously concerned running the business, and basically turned

17   the store over to him so he had control of the store so if any

18   major issues evolved it went through him.  I was more of a

19   comanager to maintain scheduling, maintain the food that was

20   ordered, minor responsibilities.

21         Q.    So was he higher than you in the chain?

22         A.    No, we were the same level, but you can't have

23   two people running a store.  Somebody has to have control.

24         Q.    Who had control?

25         A.    Tim had control.  When Tim was not there, I was

1    in control.

2              Q.    Before Tim Michaud went on sabbatical, what was

3    your position at the McDonald's restaurant in Groton?

4              A.    Time framewise it was two or three days, I was

5    at the store before Tim went on sabbatical, that was it.

6              Q.    You actually just transferred to the store then?

7              A.    Yes.

8              Q.    What was your title then, were you a store

9    manager also?

10             A.    Yes.

11             Q.    But before you worked at the Groton McDonald's

12   had you worked in another McDonald's?

13             A.    Yes.

14             Q.    Which McDonald's did you work at?

15             A.    The one on the submarine base.

16             Q.    How long were you at that McDonald's?

17             A.    Approximately eight to mine months.

18             Q.    Were you the store manager at the submarine base

19   McDonald's?

20             A.    Yes.

21             Q.    Before you worked at the submarine base

22   McDonald's did you work at a McDonald's restaurant before

23   that?

24             A.    Yes.

25             Q.    Which one?

1    well as female employees?

2         A.    Yes.

3         Q.    When did you give notice to McDonald's?

4         A.    I gave written notice or written notice to Ron

5    two weeks before the end of the month of September.

6         Q.    So around September 15th or 16th of 2001?

7         A.    Yes.

8         MR. MCNAMARA:   That is all the questions I have.

9         MR. BARTINIK:   I have no questions.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF CONNECTICUT

3

4     _____
                                      )
5     MELISSA BURFORD,                )
                                      )
6                      Plaintiff,     )
                                      ) CIVIL NO:3:02 CV 1738(DJS)
7              vs.                     )
                                      )
8     MCDONALD'S CORPORATION,         )
                                      )
9                      Defendant.     )
      _____)
10

11

12

13

14          Deposition of TIMOTHY KENNETH MICHAUD, taken

15   pursuant to FRCP Rule 30, at the law offices of Bartinik,

16   Gianacoplos, Bartinik, Bartinik & Grater, P.C., at 100 Fort

17   Hill Road, Groton, Connecticut, before Sarah J. Miner, L.S.R.,

18   a Notary Public in and for the State of Connecticut,

19   on May 8, 2003 at 10:15 a.m.

20

21

22

23

24

25

1            Q.   In mid-March of 2001, of just before a

2   sabbatical you were the store manager at the Groton,

3   Connecticut, McDonald's; isn't that right?

4            A.   Yes.

5            Q.   And at that time what was Carl Field's position?

6            A.   Store manager.

7            Q.   So in March of 2001 just before you went on

8   sabbatical there were actually two store managers at the

9   McDonald's restaurant in Groton?

10           A.   Yes.

11           Q.   Were you senior to Carl Field in March of 2001?

12           A.   No.

13           MR. MCNAMARA:  Objection.  You can answer.

14           THE WITNESS:  No.

15  BY MR. BARTINIK:

16           Q.   In March of 2001 was Carl Field senior to you?

17           A.   No.

18           Q.   And in March of 2001 you and Carl Field had

19   equal responsibility as store manager?

20           A.   Yes.

21           Q.   As of March of 2001 you had been a store manager

22   for approximately 10 years; is that accurate?

23           A.   No.

24           Q.   Well, how long were you store manager as of

25   March of 2001?

## UNITED STATES DISTRICT COURT

### DISTRICT OF CONNECTICUT

MELISSA BURFORD,
      Plaintiff,      :

      VS.            :  C.A. No. 3:02-CV-1738 DJS

McDONALD'S CORPORATION,
      Defendant.     :


DEPOSITION of MELISSA BURFORD, the Plaintiff in the above-entitled cause, taken on behalf of the Defendant before Melanie M. Chace, RPR, Notary Public, in and for the State of Rhode Island, at the offices of Holland & Knight, LLP, One Financial Plaza, Suite 1800, Providence, Rhode Island on June 27, 2003 at 10:00 a.m.


PRESENT:

FOR THE PLAINTIFF: . . . . . . BARTINIK, GIANACOPLOS, BARTINIK,
                          BARTINIK & GRATER, P.C.
                          100 FORT HILL ROAD
                          GROTON, CONNECTICUT 06340-0942
                 BY: PETER J. BARTINIK, JR., ESQUIRE

FOR THE DEFENDANT: . . . . . . HOLLAND & KNIGHT, LLP
                 BY: NEAL J. McNAMARA, ESQUIRE
                     DAMON P. HART, ESQUIRE

ALSO PRESENT: RON FEDOR


ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RI   02920
(401) 946-5500

25

1     A.  Right, classroom portion, yes.

2     Q.  How long did you work at Little Caesar's?

3     A.  I'm not sure on that.  I know I was there several

4     months.  They went out of business.

5     Q.  What did you do there?

6     A.  I was actually a manager, almost like a swing

7     manager there.

8     Q.  What do you mean by swing manager at Little Caesar's?

9     A.  I wasn't a second assistant or first assistant, I

10     was a regular manager there.  I was in charge of

11     people that worked under me, but I didn't do any

12     hiring, firing or anything like that.

13     Q.  You were a shift manager?

14     A.  Yeah, like a shift manager.

15     Q.  You left there because that store went out of

16     business?

17     A.  Yes.

18     Q.  Next job you have listed is at Crazy Horse?

19     A.  Yes.

20     Q.  What is that?

21     A.  It's a gentlemen's club.

22     Q.  What did you do there?

23     A.  I was an entertainer.

24     Q.  How did you entertain?

26

1      A.   I danced.

2   Q.   What kind of dances did you do?

3      A.   Just danced, I don't know how to explain it.

4   Q.   Was it a strip club?

5      A.   Yes.

6   Q.   Did you strip while you were dancing?

7      A.   Yes, I did.

8   Q.   Were you completely nude when you striped?

9      A.   No.

10  Q.   When you completed your strip, what was exposed and

11     what wasn't?

12     A.   We wore pasties, which cover the top part, and a

13     G string.

14  Q.   How many hours a week did you work there?

15     A.   I would say I'd go in at 5:30 and I'd be there

16     until 1:30, 2:30 in the morning.

17  Q.   How did you decide to go work there?

18     A.   A friend of mine was friends with an attorney

19     which was actually the attorney of the Crazy Horse.

20     He said to go try it, it was good money.   So I

21     thought, okay, single mom, good money, pay my bills.

22     I'll try anything once.

23  Q.   How long did you work there?

24     A.   I think it was six months, I'm not positive

ALLIED COURT REPORTERS, INC.   (401) 946-5500

27

1        because I know it wasn't the whole time I was there.

2    Q.   How many days a week did you work there?

3        A.   Sometimes five, sometimes six.

4    Q.   You worked in the evening, was Michael in school

5        during the day?

6        A.   Yes.  And that was another reason, well he had

7        quit his job because it was too much trying to go to

8        school and work because he'd have to be up in the

9        morning at five so he could catch the bus to go to

10       school.  And then he would get out of school at 2:30,

11       three o'clock.  Then he would have to turn around, he

12       would be home for like an hour and have to go to work.

13       He had told them the certain hours he could work.

14       Well, they started having him work until 1:30, two

15       o'clock in the morning.  He wouldn't get home until

16       like three, he'd only get an hour, two hours sleep and

17       have to get up and go to school.  It was killing him,

18       it was draining him, so he quit the job.  So I was

19       pretty much supporting both of us at that time.

20   Q.   What were the customers like at the Crazy Horse?

21       A.   They wore suits, it was mostly businessmen that

22       came in.

23   Q.   I would imagine that the men spend a lot of time

24       staring at you?

ALLIED COURT REPORTERS, INC.  (401) 946-5500

28

1      A.  Yes.

2   Q.  How did you deal with that?

3      A.  I just looked at it as, you know, they were

4   watching but they can't touch me.  They, if they tried

5   to touch or if they said rude comments they were

6   kicked out.

7   Q.  What kind of rude comments did people make there?

8      A.  You didn't really hear any.  They were gentleman,

9   that's why they called it a gentlemen's club.  It was

10  a very well-behaved atmosphere, nobody really caused

11  any problems.  It takes a toll on you after a while.

12  Q.  In what way?

13     A.  Bodywise, your body starts to ache.  You get to

14  the point where when you get up in the morning, you,

15  just, it takes you forever to get out of bed because

16  your body hurts.  You pretty much work every bone and

17  muscle in your body while you're dancing.

18  Q.  I would imagine that after doing that kind of work

19  with people staring at you all the time, after a while

20  you don't notice them anymore?

21     A.  Right.

22  Q.  It's as if they're not there?

23     A.  Right.

24  Q.  So it doesn't really bother you at all?

ALLIED COURT REPORTERS, INC.   (401) 946-5500

29

1    A.  Not staring, no.  After you have a kid, too, when

2    I had my daughter, I had, interns at the hospital I

3    went to is also a teaching hospital.  So I had a bunch

4    of interns that stare at you the whole time you're

5    giving birth.  So when you have all those different

6    people staring at you, that pretty much doesn't bother

7    you after a while.

8           MR. McNAMARA:  My wife has had three

9    pregnancies, three children, she said after the first

10   one, there goes the modesty.

11          THE WITNESS:  That's it.

12   Q.  How many other dancers were there that worked at the

13   Crazy Horse when you were there?

14   A.  Possibly 20.

15   Q.  How many would work at the same time?

16   A.  All of us.

17   Q.  So there would be 20 of you at various points in the

18   club dancing?

19   A.  There was only two stages.  You're only on stage

20   for maybe 15 minutes at a time.  Long enough for like

21   one song to go through.

22   Q.  You said you would be on stage 15 minutes at a time?

23   A.  Yeah.

24   Q.  You said you got there around 5:30 and would leave

30

1       around 1:30?

2       A.  Yes.

3   Q.  That's eight hours?

4       A.  Yes.

5   Q.  Out of that eight hours, how much time do you think

6       you were actually on stage?

7       A.  I don't know, it varied.  I'm not exactly sure how

8       long because you would be up for one song and most

9       songs only last maybe 15 minutes.  It's a very

10      fast-paced environment.

11  Q.  I understand that.  I'm wondering, would it be more

12      than four hours that you were on stage, for example?

13      A.  Possibly.  Like I said, I'm not sure.

14  Q.  Therefore, would you be back stage a fair bit of time?

15      A.  Yes, because once you get off stage you have fans,

16      you at least wash off, you're sweaty, you refix

17      yourself.

18  Q.  What were the other woman who worked there like?

19      A.  Very nice people.

20  Q.  Was there a lot of joking and horseplay amongst you?

21      A.  No, we weren't allowed to do that.  We weren't

22      allowed to be rude to anybody, we weren't allowed to

23      be rude to the customers, we weren't allowed to be

24      rude to each other.

ALLIED COURT REPORTERS, INC.  (401) 946-5500

31

1    Q.   I don't mean rude, I mean jokes, humor?

2         A.   We were not allowed to do that, we were not

3         allowed to do name-calling, anything.  If somebody

4         come back and was making a joke about somebody, they

5         would be suspended.

6    Q.   Even in a good-humored way?

7         A.   Yes, we were not allowed to do any of that.  They

8         said that was improper and they did not tolerate it.

9    Q.   So there was no off-colored jokes, no humor?

10        A.   If you did any of that, like I said, you were

11        suspended.  You would be suspended from the club for a

12        week at a time.  So, pretty much most of the people

13        that I worked with were single mothers, they needed

14        their money so they could pay their bills, so they

15        didn't do any of that.  We all talked, you know.

16        There was never anybody calling anybody names or

17        anything like that.

18   Q.   During the six months that you were there, how many

19        times was a dancer actually suspended for that kind of

20        behavior?

21        A.   I think there was only one that was suspended.

22   Q.   What had she done, if you remember?

23        A.   She got mad at one of the other girls.  She said

24        that she was hogging, I don't know, some of the men or

ALLIED COURT REPORTERS, INC.  (401) 946-5500

32

1    something and she was making more money and taking

2    money from the woman's pocket, or something.  I didn't

3    really get into it or pay any attention to it.  I

4    pretty much kept to myself.

5    Q.  You said before that the customers never made any rude

6    comments at all?

7    A.  If they did, the bouncers would kick them out.

8    Q.  Do you remember any rude comments that customers made

9    while you were on stage?

10   A.  No, no.

11   Q.  You never saw a customer make a rude comment?

12   A.  No.  I had one of my outfits stolen, but I never

13   had any rude comment or anything.

14   Q.  How was your outfit stolen?

15   A.  The skirt that I had, it was a wraparound skirt

16   that had Velcro and you take it off and put it on the

17   stage.  One of the guys picked it up, stuck it in his

18   pocket and kept it as a souvenir.  That happened quite

19   a bit.

20   Q.  How much did you make?

21   A.  I believe -- for the amount of time I was there,

22   you mean, the whole amount that I made?

23   Q.  An average week?

24   A.  Sometimes depending on how many times I went in,

ALLIED COURT REPORTERS, INC.  (401) 946-5500

33

1       $1,500.

2   Q.  A week?

3       A.  A week.

4   Q.  You were paid based on how many times you were on

5       stage?

6       A.  Yes, and by the tips.  Gentlemen would stick tips

7       in your garter belt.  They weren't allowed to touch

8       you anywhere up or below the garter belt.  They were

9       only allowed to put the money in there, or they could

10      throw the money on the stage.

11  Q.  How much did you make per dance?

12      A.  It varied, sometimes just in tips alone I could

13      walk off the stage with 100, $150 in tips.

14  Q.  How much did you make as salary per dance?

15      A.  That I'm not sure how much you made, they just

16      paid you for the night.

17              MR. McNAMARA:  Okay, I understand.

18      A.  So depending on how many customers was there and

19      how many were drinking was how much you got paid.

20  Q.  In order to get the tips you would have to go close to

21      the end of the stage, I would imagine?

22      A.  Yes.

23  Q.  Was there anything you did to try to encourage people

24      to give you tips?

34

1    A.  I just danced for them, that's what I was told I

2    was to do and that's what I did.  We weren't allowed

3    to do a lot of things they did in --

4                    MR. BARTINIK:  There is no question

5    pending.

6                    MR. McNAMARA:  She's continuing her

7    answer.

8    A.  I know there was one girl, I don't know, that was

9    trying to play with herself.

10                   MR. BARTINIK:  The question was anything

11   you did, what you did, that was the question.  If you

12   have anything --

13                   THE WITNESS:  I was trying to explain

14   something.

15                   MR. McNAMARA:  Your client is trying to

16   answer the question.

17                   MR. BARTINIK:  Can you read back the last

18   question?

19                   (PREVIOUS QUESTION READ BY REPORTER)

20   A.  No.

21                   MR. BARTINIK:  The question's referring

22   to what did you do to encourage, and you answered the

23   question, no.  If you want to elaborate, fine, but

24   focus on the question and answer, and the attorney can

ALLIED COURT REPORTERS, INC.  (401) 946-5500

35

1    you ask you a follow-up question.

2                MR. McNAMARA:  Mr. Bartinik, it's fine to

3    tell your client to focus on the questions, but I

4    would rather you didn't, while she's answering a

5    question, try to stop her while she's in mid answer.

6    You can't do that in court, you shouldn't do that

7    here.

8                MR. BARTINIK:  You can make your

9    statements.

10   Q.  Ms. Burford, do you know what a bed dance is?

11   A.  No.

12   Q.  I went on the Internet yesterday and put in Crazy

13   Horse, and a listing came up for it, and one of the

14   things indicated was that it says Crazy Horse

15   Gentlemen's Club, 301 40th Avenue, New Brighton,

16   Pennsylvania; that is the club you worked at?

17   A.  Yes.

18   Q.  It gives then a strip club profile, under that it

19   says, Nude club?

20   A.  That must have been after I had left because the

21   time I worked there, we wore pasties and G strings.

22   Q.  It also says, Bed dances?

23   A.  Never heard of it.  That must have happened after

24   I left the club.

ALLIED COURT REPORTERS, INC.  (401) 946-5500

49

1   Q.  Who told you that?

2   A.  Tim Michaud.

3   Q.  How much paid vacation did he tell you you were going

4   to receive?

5   A.  I was entitled to one week paid vacation.

6   Q.  As a swing manager?

7   A.  Yes.

8   Q.  Did he tell you how long you had to be a swing manager

9   before you became eligible for that?

10  A.  He told me that we were eligible the first year we

11  were there as long as we were not terminated.  He said

12  if we had gotten our paid vacation and was terminated,

13  our last paycheck we would receive, they would take

14  that back for the week we had received the paid

15  vacation.

16  Q.  Run that by me again?

17  A.  I know it's confusing.  He said they were eligible

18  to go ahead and give us the week in our first year,

19  even they they we hadn't been there a year.  But if we was

20  to be terminated or quit our job, that the last week

21  we worked that pay we would not receive it, it would

22  go back to pay for the week paid vacation.

23  Q.  I'm still a little confused about at what point you

24  became eligible according to Tim Michaud for a week's

ALLIED COURT REPORTERS, INC.   (401) 946-5500

50

1    paid vacation?

2    A.  He said at any time in the first year that I was

3    eligible to take a week's paid vacation.

4  Q.│ At what point would you -- strike that.  You just said

5    a minute ago that if you took a week's paid

6    vacation --

7    A.  The first year I was there, even though I hadn't

8    been there a year, I was still eligible for my first

9    paid vacation in that year at any time.  But if I was

10   to be terminated or to quit, they would take my last

11   paycheck to cover that paid vacation that I did take.

12 Q.│ So, in effect you really weren't eligible for paid

13   vacation because they would take that back?

14   A.  Yeah, if I quit or was terminated, yes.

15 Q.│ So my question is, at what point would you be --

16   A.  I would have to be there.

17 Q.│ Wait until I finish.  At what point would you be able

18   to take paid vacation and if you left or were

19   terminated you would still get your last week's pay?

20   A.  One year.

21 Q.│ One year being a swing manager?

22   A.  Yes.

23 Q.│ So then, that would have been January 19 of 2002?

24   A.  Right.

ALLIED COURT REPORTERS, INC.   (401) 946-5500

54

1    hours anyhow.

2  Q.  How many other swing managers were there at that

3      point?

4      A.   I would say there was Julita, Lori, and Richard,

5      so there was only three other ones besides myself.

6  Q.  How many crew members worked at the store

7      approximately at that time?

8      A.   35 to 40.

9  Q.  Above a swing manager at McDonald's is a second

10     assistant manager; is that right?

11     A.   Yes.

12 Q.  Do you know what the requirements of the position of a

13     second assistant manager are?

14     A.   Yes.

15 Q.  What are they?

16     A.   You have to have more open availability because

17     you have to work different shifts.  You have to be

18     able to open, do a mid and close.

19 Q.  When did you become aware of that requirement?

20     A.   When I was asked if I wanted to take on that

21     position.

22 Q.  When were you asked that?

23     A.   It was like May, May of 2001.

24 Q.  Who asked you?

ALLIED COURT REPORTERS, INC.   (401) 946-5500

57

1   A.   He told me what the requirements were, that, you

2   know, I was going to have to open my availability,

3   which I said, 'Okay, let me look into some daycare.'

4   With the amount of money that they were going to give

5   me for second assistant, I could afford daycare.

6   Daycare isn't cheap.  So I said, 'Let me check into

7   that and we'll go from there.'

8   Q.   Did you check into daycare?

9   A.   Yes.

10  Q.   What did you find out?

11  A.   That there was a daycare right down the street

12  from me that I could have got my daughter into.  The

13  bus would actually drop her off at the daycare and

14  either Mike or I could pick her up.

15  Q.   Did you communicate this to Mr. Field?

16  A.   Yes, I did.

17  Q.   When?

18  A.   About two weeks after he had asked me to become a

19  second assistant.

20  Q.   Then what did he say?

21  A.   Okay, great, they said we should have no problem.

22  He said you're the next one in line, the job is yours.

23  Q.   What other second assistant managers, if any, were

24  there in the store at that point?

ALLIED COURT REPORTERS, INC.   (401) 946-5500

58

1      A.   Vern and Louise.   Louise was actually moving up to

2      first assistant.

3   Q.  What is Vern's last name?

4      A.   Brown.

5   Q.  What about Louise?

6      A.   Sheriff.

7   Q.  Sheriff?

8      A.   Uh-huh.

9   Q.  Did you understand there to be a limited number of

10      second assistant manager positions in the store?

11      A.   They told us they were allowed up to three second

12      assistants in the store because of the abundance of

13      business that that store does.

14   Q.  When you say they, who was it that told you that?

15      A.   Tim and Carl.

16   Q.  When did Tim tell you that?

17      A.   After he came back.

18   Q.  Do you know what Carl meant when he said that you were

19      next in line?

20      A.   I was the most qualified for the position.

21   Q.  To go back a little bit before we keep going, you

22      worked 5:30 to 1:30?

23      A.   Uh-huh.

24   Q.  During that period of time about how many employees

ALLIED COURT REPORTERS, INC.   (401) 946-5500

74

1   us, the employees to put our belongings in when we got

2   there.  He moved that into the crew room.  That kind

3   of stuff.

4   Q.  Did other employees in the store seem receptive to

5   Carl when he arrived?

6   A.  Yeah, we all seemed to think that he was a nice

7   guy, that he was making some better changes for the

8   store.

9   Q.  Was there a time after Carl arrived that you gave

10  notice?

11  A.  Yes.

12  Q.  When did that happen?

13  A.  I'd been there -- he'd been there for several

14  months.  It was pretty much after, well, he had made a

15  few comments to me.  I also had given notice due to I

16  was tired of taking up the slack for everybody else.

17  I was coming in in the morning and things weren't

18  being done at night for close, things were being left

19  on that they were leaving, like coffee pots on.  At

20  one time the back door was open, it wasn't even

21  locked, somebody could have walked right in.  Things

22  like that.  Nobody was doing the food safety book

23  then, they were saying, okay, even though my shift was

24  done at eleven, 10:30, eleven, during transition that

ALLIED COURT REPORTERS, INC.  (401) 946-5500