UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MELISSA BURFORD,<br><br>    Plaintiff,<br><br>v.<br><br>MCDONALD'S CORPORATION,<br>CARL FIELDS, TIMOTHY<br>MICHAUD and RON FEDOR,<br><br>    Defendants. | C.A. No. 3:02-CV-1738 MRK |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MCDONALD'S CORPORATION'S MOTION FOR SUMMARY JUDGMENT

Defendant, McDonald's Corporation ("McDonald's"), respectfully submits this memorandum of law in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and the Local Rules of this Court.

### INTRODUCTION

Plaintiff, Melissa Burford ("Burford"), a former employee of McDonald's at its Groton, Connecticut restaurant filed this action against McDonald's and three of its managers in their individual capacities asserting claims for sexual harassment in violation of the Connecticut Fair Employment Practices Act and Title VII of the Civil Rights Act of 1964 in addition to various related tort claims.[1] The thrust of Burford's claim is that she was subjected to a sexually hostile work environment as a result of alleged sexual harassment by her former supervisor, Carl Field ("Field").

---

[1] This Memorandum is in support of only McDonald's motion for summary judgment. The individual defendants, Field, Fedor and Michaud, are simultaneously filing a separate memorandum in support of their motions for summary judgment.

# 1353482_v3

Burford's sexual harassment claims should be dismissed on summary judgment because she her allegations fall short of establishing the existence of a hostile work environment. Likewise, her tort claims must fail.

## FACTUAL BACKGROUND

Melissa Burford was hired as a crew member at the Groton store effective November 20, 2000.[2] See Defendants' Local Rule 56(a)(1) Statement In Support of Their Motion For Summary Judgment, ("Statement"), ¶ 17. She was promoted to the position of swing manager effective February 19, 2001. See Statement, ¶ 17. The Groton store's time records indicate that Burford generally opened the store on Monday through Friday, working from 5:00 a.m. until 1:00 p.m. See Statement, ¶ 17. Prior to working at McDonald's, plaintiff worked for six months as an exotic dancer at a gentlemen's club who, according to plaintiff, stripped down to pasties and a G-string. See Statement, ¶ 17.

### McDonald's Management

McDonald's restaurants employ four levels of store managers, the first three of which represent different levels of training to become a store manager. See Statement, ¶ 1. The lowest level is a swing or shift manager, which is responsible for learning and understanding McDonald's policies and procedures in order to prepare for managing shifts in a McDonald's restaurant. See Statement, ¶ 1. The next level of management is second assistant manager which is responsible for managing people, products and equipment to execute outstanding quality service, cleanliness and value on all assigned shifts. See Statement, ¶ 2. The next level of

---

[2] For a complete statement of the relevant facts, please see Defendants' Local Rule 56(a)(1) Statement In Support of Their Motion For Summary Judgment

# 1353482_v3

- 2 -

management is the first assistant manager. See Statement, ¶ 3. A first assistant manager is continuing the process of training to manage a restaurant, and is responsible for assisting the restaurant manager in executing virtually all aspects of the restaurant operations. See Statement, ¶ 3. Finally, the restaurant manager is responsible for the entire operation of a single McDonald's restaurant. See Statement, ¶ 4. An operations manager is responsible for all restaurants in a certain geographic area. See Statement, ¶ 5.

### The Individual Defendants

At all relevant times, defendant Ron Fedor was the operations manager with responsibility for the McDonald's store on Long Hill Road in Groton, Connecticut. See Statement, ¶ 9. He was an employee of McDonald's between November 1992 and November 2001. During his employment there were never any allegations that he sexually harassed any employee. See Statement, ¶ 9.

At all relevant times, defendant Timothy Michaud was a McDonald's restaurant manager. See Statement, ¶ 10. He worked for McDonald's between 1990 and 2003. Mr. Michaud was never the subject of a complaint of sexual harassment while in the employ of McDonald's. See Statement, ¶ 10. Michaud was on sabbatical between April 2, 2001 and June 11, 2001. See Statement, ¶ 10.

At all relevant times, defendant Carl Field was a McDonald's restaurant manager. See Statement, ¶ 11. Mr. Field was employed by McDonald's between May 1996 and September 2001. See Statement, ¶ 11. Other than the allegations raised by Melissa Burford, Mr. Field has never been the subject of a complaint of

# 1353482_v3

sexual harassment while employed by McDonald's. See Statement, ¶ 11. It is McDonald's policy and practice that management employees like Field sign the sexual harassment policy only after completing sexual harassment training for managers. See Statement, ¶ 11 Field signed the policy on May 16, 1996. See Statement, ¶ 11. Carl Field was promoted to the position of store manager effective February 27, 2000. See Statement, ¶ 12. In or about March 2001 he was transferred to the Groton store as manager. See Statement, ¶ 12.

The manager of that store, Tim Michaud, was going on a ten week sabbatical, and Field was to manage the store in his absence. See Statement, ¶ 12. Field and Michaud were in the store together for a period of time in order to smooth the transition. Michaud went on sabbatical as of April 2, 2001. See Statement, ¶ 12. Michaud and Field both held the position of store manager in the Groton store. See Statement, ¶ 13. During the time that they were both working in the Groton store, Michaud exercised no control over Field's employment. See Statement, ¶ 13. He could not discipline or terminate Field for alleged harassment. See Statement, ¶ 13. Field was transferred from Groton to be the manager of the Niantic, Connecticut store, effective July 15, 2001. See Statement, ¶ 33.

### McDonald's Sexual Harassment Policy

McDonald's has a comprehensive sexual harassment policy. See Statement, ¶ 14. It is McDonald's policy and practice that new employees like Burford sign the policy only after receiving sexual harassment training for employees. See Statement, ¶ 14. Burford signed her copy of the policy on November 28, 2000. See

# 1353482_v3

- 4 -

Statement, ¶ 14. Pursuant to the policy, "any employee that feels subjected to discrimination or harassment should immediately report it to their human resources representative." See Statement, ¶ 14. As an alternative to human resources, employees may report their complaint to their regional manager or officer in charge." See Statement, ¶ 14. During the relevant period, a sign was posted in the crew room of the Groton store stating that McDonald's does not tolerate sexual harassment. See Statement, ¶ 15. During the relevant period each employee's paycheck stub included a reference to the McDonald's Service Center and the telephone number of that center to remind employees that they can call the center for assistance. See Statement, ¶ 16.

### Plaintiff's Allegations

Burford alleges that she experienced the following alleged sexual harassment:

(a) Field rubbed his body up against hers telling her that she had "a sweet little ass" when they both happened to be in the stock room. See Statement, ¶ 18;

(b) Field made comments about her tattoo on her chest at managers' meetings, every other week. See Statement, ¶ 18. He would also say at those meetings that he wanted to look down her shirt. See Statement, ¶ 18. Managers' meetings took place every Tuesday afternoon for one hour. See Statement, ¶ 18;

(c) Field rubbed Burford's shoulders once, she told him to stop and he never did it again. See Statement, ¶ 18;

(d) On Memorial Day 2001, Field came in to the store and saw that employees Tammy Sabados, Louise Sheriff and Burford all had red hair. See Statement, ¶ 18. He "made the comment that he was going to dye all of his hair red, he said, including down there. See Statement, ¶ 18. Then he looked at me and said, 'that will make us hotter in bed together.'" See Statement, ¶ 18.

# 1353482_v3

These incidents occurred over an approximately two week period between May 28, 2001 and June 11, 2001: Burford stated that "[M]y problems with Carl began <u>after</u> I gave my two weeks notice. See Statement, ¶ 19. Burford testified that there were no incidents of sexual harassment for approximately three weeks after she gave notice. See Statement, ¶ 19. During that two week period, Burford and Field were both in the store for a total of 15.5 hours, including scheduled time as well as a one hour managers' meeting on June 5. See Statement, ¶ 19. According to Burford, the sexual harassment ceased after Michaud returned, on June 11. See Statement, ¶ 21.

Burford alleges earlier incidents with Field prior to the time when Burford gave notice. See Statement, ¶ 22. However, she stated that her giving notice had nothing to do with the incidents, and that her problems with Field began only after she gave notice. See Statement, ¶ 22. Burford did not give notice because of any personal issues with Field: "I mean, he had already done some of the things to me at that time, but it had nothing to do with that, no." See Statement, ¶ 24.

The "pre-notice" incidents are as follows:

(a) Field stuck his tongue out at Burford, and she stuck her tongue out at him. Then Field came up to Burford and said, "that he knew how to use his tongue, that he wanted to find out how I used my tongue, and that he was going to find that out". See Statement, ¶ 26. This occurred in April or May 2001. Field made the tongue comment on one occasion. See Statement, ¶ 26.

(b) Field came up to Burford and tapped her "on the butt" on several occasions. See Statement, ¶ 26.

(c) Field said "you can kiss my ass" to Burford, and said that it would not take long to kiss her ass. See Statement, ¶ 26.

Second Assistant Manager

Field asked Burford in May 2001 whether she was interested in becoming a second assistant manager. See Statement, ¶ 29. Burford states that Field told her that she was "in the process of becoming the second assistant." See Statement, ¶ 32. He also told her at the time that she "was going to be the second assistant manger." See Statement, ¶ 32. Field told Burford that the position of second assistant manager required open availability, i.e. complete time flexibility as to her ability to work. See Statement, ¶ 31. As a result, Burford states that she checked into daycare options to see if she would be able to take the position. See Statement, ¶ 31. She subsequently told Field that she had located daycare for her daughter. See Statement, ¶ 31. However, she did not tell him that there was an exact date on which the daycare was available and she could assume the position as second assistant manager. See Statement, ¶ 31.

According to Burford, there could be three second assistant managers in the Groton store. See Statement, ¶ 30. As of May 2001, Vernon Brown and Louise Sheriff were both second assistants. See Statement, ¶ 30. However, Burford stated that Sheriff was "moving up to first assistant" at the time. See Statement, ¶ 30. Timothy Meredith was promoted to the position of second assistant manager in the Groton store effective July 16, 2001. See Statement, ¶ 34. No one in a position of authority at McDonald's ever told Burford that she would not become a second assistant manager because Meredith had become one. See Statement, ¶ 35. The

# 1353482_v3

- 7 -

benefits for swing managers and second assistant managers were identical. See Statement, ¶¶6-8.

### Burford Complains, and McDonald's Responds

Burford first called the McDonald's Service Center to complain of sexual harassment on July 13, 2001. See Statement, ¶ 36. Burford also called the Service Center twice on July 17, 2001 to complain that she was "verbally offered" the position of assistant manager but that the position was given to someone else, and that she was being sexually harassed by the acting store manager Carl Field. See See Statement, ¶ 36. There is no record that she called the Service Center on any other occasions. See Statement, ¶ 36. Similarly, Burford never complained to the regional human resources representatives prior to July 2001. See Statement, ¶ 36.

On July 17, 2001, Burford came into the store and argued with Meredith because he had been promoted to second assistant manager. See Statement, ¶ 37. When Michaud came in on July 17, he told Burford that she had no right to argue with Meredith or to question Michaud regarding giving him a position as a second assistant manager, and told her to go home. See Statement, ¶ 38. That same day, when she got home, Burford called Fedor, the operations manager to complain about Tim Meredith. See Statement, ¶ 39. That afternoon Burford received a telephone call from Steven Goulart, a human resource representative for McDonald's. They talked and arranged a time to meet in person. See Statement, ¶ 40.

# 1353482_v3

- 8 -

On July 18, Burford talked again with Fedor, who told her that she was being transferred to the Waterford, Connecticut McDonald's store at her request. See Statement, ¶ 41  Burford was transferred to the Waterford store, effective July 23, 2001, as a swing manager. See Statement, ¶ 41.  On July 18, Burford met with Goulart, who told her that he would conduct an investigation into all her complaints. See Statement, ¶ 42.  She signed a statement, dated July 18, setting forth her complaints. See Statement, ¶ 42.

Goulart conducted an investigation which consisted of interviews of several employees identified by Burford, as well as Field and Fedor. See Statement, ¶ 43. The interviewed employees included Tammy Sabados, Vernon Brown, Grant Polippo, Tonya Glassco, and Louise Sheriff. See Statement, ¶ 43.  In late August 2001, Goulart prepared a "final written warning" to deliver to Field with regard to the results of the investigation. See Statement, ¶ 44.  Field resigned from McDonald's to pursue another position effective September 28, 2001.  He gave his notice two weeks prior. See Statement, ¶ 45.

According to Burford, the atmosphere at the Waterford store was "nice." See Statement, ¶ 47.  Nevertheless, she resigned effective August 9, 2001. See Statement, ¶ 47.

## ARGUMENT

### I. McDonald's Is Entitled to Summary Judgment.

"A motion for summary judgment will be granted where there is no genuine issue as to any material fact, and it is clear that the moving party is entitled to judgment as a matter of law." Russell v. Eldredge, 832 F. Supp. 535, 537 (D. Conn.

# 1353482_v3

1993) (citations omitted). Although the moving party has the initial burden of establishing that no material factual issues exist, "once that burden is met, the opposing party must set forth specific facts demonstrating that there is a genuine issue for trial." Salvestri v. United States, 771 F. Supp. 515, 516 (D. Conn. 1999); see also McKenzie v. Wyndham Comm. Mem. Hosp., 774 F. Supp. 91, 94 (D. Conn. 1991). A scintilla in support of a plaintiff's position is insufficient; there must be evidence from which a jury could reasonably find in her favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

The plaintiff may not defeat summary judgment by resting on "mere allegations" but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A plaintiff cannot overcome summary judgment, therefore, by "offering purely conclusory allegations of discrimination, absent any concrete particulars . . . ." Meiri v. Dacon, 759 F.2d 989, 998 (2nd Cir. 1985). Mere assertions and conclusions of the party opposing summary judgment are not enough to defeat a well-pleaded motion. Lamontagne v. E.I. Du Pont de Nemours & Co., 834 F. Supp. 576, 580 (D. Conn. 1993) aff'd, 41 F.3d 846 (2nd Cir. 1994). McDonald's is entitled to summary judgment on all counts against it because Burford's claims suffer from legal defects leaving no triable issue for a jury.

## II.   McDonald's Is Entitled To Summary Judgment As A Matter Of Law On Burford's Sexual Harassment Claim.

### A.   Burford Has Not Established That She Was Subjected To A Hostile Work Environment.

Burford has alleged that she experienced a hostile work environment as a result of sexual harassment by Carl Field. To succeed on her claim, Burford must

# 1353482_v3

- 10 -

demonstrate that her working environment "was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of [her] employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citation and internal quotations omitted); Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310, 318 (2nd Cir. 1999).[3] "[I]n order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998). [4] Whether an environment is "hostile" or "abusive" depends on the totality of the circumstances. See Harris, 510 U.S. at 23. In evaluating Burford's claim, this Court must consider: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interfered with Burford's work performance. Brennan, 192 F.3d at 319 (citing Harris, 510 U.S. at 23).

Title VII is not "a general civility code." Oncale v. Sundowner Offshore Services, 534 U.S. 75, 81 (1998). "The prohibition of harassment on the basis of sex

---

[3] The Connecticut Fair Employment Practices Act and Title VII have similar language, and legislative intentions. Thus, Connecticut courts routinely look to Federal application of Title VII in applying the state's anti-discrimination laws. Levy v. Connecticut Commission on Human Rights and Opportunities, 671 A2d. 349, 356 (Conn. 1996); Brittell v. Ct. Dep't of Corrections, 247 Conn. 148, 164 (Conn. 1998) ("In defining the contours of an employer's duties under our state antidiscrimination statutes, we have looked for guidance to federal case law interpreting Title VII of the Civil Rights Act of 1964, the federal statutory counterpart to § 46a-60."). As a result, the defendants' arguments herein apply with full force to Burford's claims under both acts.
[4] As the conduct alleged in neither severe or pervasive, it is not objectively offensive. Similarly, the conduct could not have been subjectively offensive to an individual who worked as a stripper for six months and did not find the nature of the work offensive. Statement, ¶17.

# 1353482_v3

requires neither asexuality not androgyny in the workplace..." Id. "Stepping out of one's home into the working world means, to some extent, subjecting oneself to the slings and arrows of daily life. Title VII does not codify Emily Post's rules of etiquette." Feliciano v. Alpha Sector, Inc., 2002 WL 1492139 *8 (S.D.N.Y.). Thus, "simple teasing, offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher, 524 U.S. at 788; Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997) ("Not every unpleasant workplace is a hostile environment. The occasional vulgar banter tinged with sexual innuendo, of coarse or boorish workers would be neither pervasive nor offensive enough to be actionable. The workplace that is actionable is one that is hellish."). (emphasis added.) The incidents of allegedly offensive conduct must also be "more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)(citation and internal quotation marks omitted). In other words, "for [sexist] comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of [sexual] enmity." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997).

Burford's allegations do not establish a hostile work environment, but rather boil down to a few sporadic, minor incidents.

> On Memorial Day, (which occurred on May 28, 2001) a few of the managers dyed their hair red and Field said to Burford and others that "he was going to dye all of his hair red...including down there... that would make us hotter in bed together." Statement, ¶18;

# 1353482_v3

- 12 -

> Field rubbed his body up against hers on several occasions when they both happened to be in the stock room telling her that she had "a sweet little ass." Statement, ¶18;
>
> Field made unspecified comments about a tattoo on Burford's chest at managers' meetings every other week. He would also say at those meetings that he wanted to look down her shirt. [Based on Burford's timeline, this could have occurred no more than once]. Burford, however, admits that "a little bit of my tattoo sticks out" in outfits she wore. Statement, ¶18; and
>
> On one occasion, Field approached her and rubbed her shoulders saying "you look tense and tight like you need a massage." Burford says she told Field to stop, which he did, and he never rubbed her shoulders again. Statement, ¶18.

These incidents occurred over an approximately two week period between May 28, 2001 and June 11, 2001. Indeed, the time records for that period reveal that Burford and Field were both in the store for a total of 15.5 hours. Statement, ¶20.

McDonald's calculated the time frame at issue based on the following. Burford stated that "[M]y problems with Carl began <u>after</u> I gave my two weeks notice. Carl changed after this happened. I gave notice due to lax procedures, short-handed shifts and no actions by the managers to correct." (Emphasis added.) Statement, ¶19. She testified that she gave her notice at the time that Julita Baumgardner quit. Baumgardner quit on or about May 12, 2001. In addition, Burford testified that there were no incidents of sexual harassment for approximately three weeks after she gave notice.[5]

---

[5] Burford has on the one hand alleged that additional incidents of sexual harassment occurred during the period after April 2, 2001, when Michaud went on sabbatical, and before she gave notice, on May 12, 2001, but in the same breath then denied that those incidents constituted harassment when she stated that her problems with Field began after she gave notice, and testified that her

# 1353482_v3

- 13 -

The Second Circuit, and District Courts within the Circuit, have routinely granted summary judgment dismissing hostile environment sexual harassment claims alleging far more severe, offensive and numerous incidents than what Burford alleges. See e.g., Brennan, 192 F.3d at 318 (finding as a matter of law that the display of nude pictures and one incident of "sexual banter" insufficient); Quinn v. Green Tree Credit Corp., 159 F.3d 768, 767 (2nd Cir. 1998)("Though the two incidents in question - [supervisor's] comment, apparently regarding [plaintiff's] posterior, and his use of papers held in his hand to touch her breast -- are obviously offensive and inappropriate, they are sufficiently isolated and discreet that a trier of fact could not reasonably conclude that they pervaded [plaintiffs] work environment. Nor are these incidents, together or separately, of sufficient severity to alter the conditions of [plaintiff's] employment without regard to frequency or regularity."); Winiarski v. Connecticut Dep't of Public Health, 273 F. Supp. 2d 189, 193 (D. Conn. 2003)(finding as a matter of law plaintiff failed to establish hostile work environment where a male co-worker: accused her of flirting, spread his legs in a suggestive way, ate food off of her place at a retirement party, put his arm around her waist and called her a 'difficult woman' when she pulled away); Hall v.

---

notice had "nothing to do with" any personal problems with Field. Statement, ¶¶22-25. Those incidents are as follows:

> She and Field stuck their tongues out at each other on one occasion, and she claims that Field said words to the effect that he knew how to use his tongue and he wanted to find out if Burford knew how to use hers. Statement, ¶26;
>
> Several bumps or taps on the backside. Statement, ¶26; and
>
> Field said "kiss my ass" to her on a couple of occasions, and said it would not take long to kiss her ass. Statement, ¶26.

# 1353482_v3

South Central Connecticut Regional Water Auth., 28 F. Supp. 2d 76, 80 (D. Conn. 1998) (finding one supervisor asking plaintiff about her menstrual period, calling her a "bimbo" and "stupid woman" and another supervisor telling the plaintiff that he found his wife in bed with another woman is insufficient to support a claim that plaintiff was subjected to abuse of sufficient severity or pervasiveness so as to alter the conditions of her employment); Phillips v. Merchants Ins. Corp., 3 F. Supp. 2d 204, 206 (N.D.N.Y. 1998) (finding supervisor's commenting that "she did not care whether [plaintiff] had to dance naked in the snow to get business," asking plaintiff "if he thought he was a big man on campus"; directing profanity at him and calling him names such as "little boy," "tough son-of-a-bitch" and "dumb man" although offensive, when examined in context appear far more hostile and angry than sexual. Behavior that is immature, nasty or annoying without more is not actionable as sexual harassment); LeMar v. Nynex Serv. Co., 891 F. Supp. 184, 185 (S.D.N.Y. 1995) (finding supervisor's touching of plaintiff's hand while observing that she "looked really hot" combined with vulgar sexual remarks on four occasions was "too mild and innocuous to constitute sexual harassment as a matter of law."); Legnani v. Attalia Linee Aeree Italiane, 1997 WL 642556 at *3 (S.D.N.Y. Oct. 16, 1997) (holding that four or five incidents over a two month period "did not establish pervasiveness."). 6

---

[6] Likewise, other jurisdictions have made similar findings. See e.g., Sheppard v. Comptroller of Public Accounts, 168 F.3d 871, 872-75 (5th Cir. 1999) (finding insufficient claim that in a two year period, co-worker made impertinent and intimate observations about plaintiff's anatomy, attempted to look down her shirt and touched her multiple times); Black v. Zaring Homes, Inc., 104 F.3d 822, 823-24 (6th Cir. 1997) (finding insufficient repeated sexual jokes, and at least five other sexually offensive remarks in a four month period); Sprague v. Thorne Americas, Inc., 129 F.3d 1355, 1365-66 (10th Cir. 1997) (holding insufficient five sexually offensive statements in a sixteen month period,

# 1353482_v3