

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MELISSA BURFORD | : | CIVIL NO: 3:02 CV 1738 (MRK) |
| | : | |
| V. | : | |
| | : | |
| McDONALD'S CORPORATION ET AL | : | JANUARY 12, 2004 |

**PLAINTIFF'S SUR REPLY MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT DATED NOVEMBER 21, 2003**

The plaintiff, Melissa Burford, hereby submits this memorandum of law in response to the defendants' submission dated January 2, 2004 entitled Reply Memorandum in Support of Defendants' Motion for Summary Judgment, and in response to the defendants claim on their Reply Memorandum of Law dated January 2, 2004. On this date the plaintiff has also filed her Amended Plaintiff's Local Rule 56(a)2 statement.

**The Plaintiff has Disputed the Defendant's Material Facts Numbers 18-27, and Those Facts Should Not Be Deemed Admitted as the Defendant Requests. Also, the Plaintiff has Submitted an Amended Local Rule 56(a)2 Statement.**

The defendants have unfairly misinterpreted the meaning of the plaintiff's admissions and denials to the defendant's Local Rule 56(a)1 statement of facts numbers 18-27. In those facts the defendants describe acts of sexual harassment. The in her Local Rule 56(a)2 statement dated December 15, 2003 the plaintiff states that she "denies the defendants' characterization of the plaintiff's claims" in response to defendants' statement of facts numbers 18-27. The plaintiff

then referred to her statement of disputed facts. The plaintiff's response was meant to be a clear denial of the facts as alleged by the defendants because the defendants have minimized the plaintiff's allegations in their attempt to win on summary judgment. For the plaintiff to simply deny the facts without explanation would have been confusing to the reader because it might appear to the reader that the plaintiff was denying that the articulated facts of sexual harassment occurred.

To clarify, the plaintiff has prepare an amended Local Rule 56(a)2 statement addressing the facts numbered 18-27. That statement is attached as the Amended Plaintiff's Local Rule 56(a)2 Statement which contains responses to the defendant's Local Rule 56(a)1 statement of facts numbers 18-27.

**<u>The plaintiff has neither embellished nor contradicted her testimony.</u>**

The defense claims that the plaintiff has made some claims now that were not addressed in her deposition. The defense claims that the plaintiff "now alleges that Field: (1) stared at her; (2) called her honey; (3) poked her and bumped into her, and (4) said "mmmm" in an allegedly sexual manner." The defendants imply that these allegations were not made previously, and are new allegations. This is not true. First, the allegations to which the defendants refer are all in the plaintiff's complaint, and are supported by testimony of various witnesses as described in the plaintiff's Local Rule 56(a)2 statement of facts. The allegations are not a surprise to the defense. Second, the allegations are supported by the plaintiff's deposition testimony. Even page 98,

BARTINIK, GIANACOPLOS, BARTINIK, BARTINIK & GRATER, P.C.
P.O. BOX 942 • GROTON, CONNECTICUT 06340-0942 • 860-445-8521 • JURIS NUMBER 01220

which was cited by the defense in support of the defense position, contains the plaintiff's allegations of "touching" and "rude comments." Plaintiff's deposition, page 98 line 17. The plaintiff properly answered all of the questions posed to her at her deposition, and if the defendant sought more detail they could have asked more detailed questions, or could have inquired further about the specifics of the "touching" and "rude comments." The fact remains, however, that the question of whether or not the plaintiff embellished or contradicted herself is a question of fact for the jury.

Additionally, the defense also claims that the plaintiff has expanded on her allegations of sexual harassment that occurred after Tim Michaud returned on June 11. That is not a fair characterization because, again, the plaintiff simply answered all of the questions posed to her at the deposition. Review of the depositions indicates that the plaintiff fairly answered the questions asked. In her deposition on page 99 line 23 through page 103 is an exchange in which the plaintiff explains the comments made to her, and then recounts an "example" of the comments. The question called for an "example." Plaintiff's deposition page 101 line 24.

Moreover, contrary to the defendant's assertion, the comment made by Mr. Field and Mr. Michaud have a sexual implication because Mr. Michaud and Mr. Field were making fun of the plaintiff because she complained about sexual harassment, and the nature of the fun was to sarcastically say that they could not say certain things because then the plaintiff might accuse them of sexual harassment.

BARTINIK, GIANACOPLOS, BARTINIK, BARTINIK & GRATER, P.C.
P.O. BOX 942 • GROTON, CONNECTICUT 06340-0942 • 860-445-8521 • JURIS NUMBER 01220

Also, the defense makes much to do about the statement taken by the defendants' HR representative Steve Goulart. Generally, the defense attempts to claim that some of the plaintiff's allegations were omitted in the statement given to Mr. Goulart. A factual dispute exists between the defense and the plaintiff about the nature or purpose of that statement. The Goulart statement was handwritten by Mr. Goulart was not intended to be a listing of each and every incidence of sexual harassment. Mr. Burford never read the statement. All of the issues raised by the defense with regard to the weight to be given to the Goulart statement, and whether or not the statement is consistent with the claims by the plaintiff at trial are factual questions for the jury to resolve.

The defense cites the case of Ursini v. Goldman, 118 Conn. 554 (1934) for the proposition that "a party cannot avoid a document she has signed on the ground that she did not read it." (copy attached). The case does not stand for the proposition for which it is offered. Also, even in the defense brief the meaning of "avoid[ing] a document she has signed" is unclear. How does this vague defense rule apply to this pending motion for summary judgment? The only relevant rule from the Ursini case is that whether or not someone is negligent under the circumstances for not reading a document is a question of fact for the jury. In fact, for purposes of this motion for summary judgment, the case strongly supports the plaintiff.

In Ursisi the plaintiff Ursini was a shop owner, and the defendant Goldman was his insurance agent. Ursini purchased burglary insurance coverage through Goldman. When his

BARTINIK, GIANACOPLOS, BARTINIK, BARTINIK & GRATER, P.C.
P.O. BOX 942 • GROTON, CONNECTICUT 06340-0942 • 860-445-8521 • JURIS NUMBER 01220

shop was burglarized, he made a claim on his burglery insurance policy. His claim was denied by the insurance company because Ursini had been burglarized in the past, and that fact was omitted from his insurance application voiding the policy. Ursini sued the insurance company. He lost the case since he had, in fact, been burglarized in the past, and that fact was omitted from the policy.

Ursini then sued his insurance agent Goldman for breach of contract. In his case against Goldman, Ursini claimed that he was unable to recover on the policy because Goldman had neglected to inform the insurance company that Ursini's shop had been burglarized in the past. The claim against Goldman was for breach of contract. Although he signed the policy application, Ursini never read it when Goldman handed it to him. Instead, Ursini relied on his insurance agent Goldman to provide him a policy that would provide him the proper coverage. A factual issue existed in that case about whether or not Goldman knew about the prior burgerly. The case went to the jury on a breach of contract theory, and not on a negligence thoery. The trial court instructed the jury on the contract claim that if the jury found that if the plaintiff Ursini was negligent in not reading or "informing himself" of the contents of the policy then the jury must find for the defendant. The jury found for the plaintiff.

The defendant appealed claiming that the case should have gone to the jury on a negligence theory. In 1934 the law of contributory negligence would have barred the plaintiff from any recovery. The Connecticut Supreme Court court stated that the case could have been

brought under a negligence theory or a contact theory. The court found that the case was properly plead under a contract theory, and was presented to the jury as a breach of contact case. Also, the court found that the defendant Goldman was not prejudiced by the fact that there was no contributory negligence instruction since the trial court instructed the jury that the jury should find for the defendant if the plaintiff was negligence in not reading the policy before he signed it. Since the jury found for the plaintiff, according to the court, then they obviously found that the plaintiff was not negligent for not reading the policy under the circumstances. The court also found that the question of whether the plaintiff was negligent in not reading the policy application was a factual matter for the jury.

Therefore, the case does not stand for the proposition suggested by the defense. If anything, the case makes clear that whether or not the plaintiff should have read the statement she made to Mr.Goulart before signing it is a question of fact. Her statement to Mr. Goulart, however, is not a contract, and even the defense is not claiming that the plaintiff is bound to her statement the way a person is bound to a contract. More on point, the question of whether or not there are any inconsistencies in the plaintiff's statements either to Mr. Goulart, or in her deposition either by omission or inconsistency are all questions of fact. Furthermore, the relative import of such inconsistencies about whether or not the plaintiff is being truthful in her allegations are all questions of fact.

BARTINIK, GIANACOPLOS, BARTINIK, BARTINIK & GRATER, P.C.
P.O. BOX 942 • GROTON, CONNECTICUT 06340-0942 • 860-445-8521 • JURIS NUMBER 01220

Lastly, with regard to the transfer to the Waterford store the plaintiff has been entirely consistent with her testimony. The defense mischaracterized the plaintiff's deposition testimony, and whether or not it is consistent with her affidavit. In her deposition the plaintiff described the fact that she originally asked to be transferred to Waterford due to sexual harassment, but she was never transferred. At the time she was eventually transferred it was not to satisfy her prior request. It was because Tim Michaud had told Ron Fedor that he did not want her in the Groton store anymore. See plaintiff's affidavit January 9, 2004 paragraph 1.

**The testimony of other witnesses are questions of fact.**

The defense claims that the testimony of the other witnesses is not very important. That question itself is a question of fact. The testimony of the witnesses as presented in the plaintiff's Local Rule 56(a)2 statements of fact speaks for itself.

The defense makes some claims that are false. With regard to Alma Toro the defense is inaccurate when they state that Mr. Field misused the Spanish word for "croch" only in the context of attempting to learn Spanish. Alma Toro clearly states that he "intentionally" mispronounced the word. Plaintiff's statement of fact 18, and also see Toro deposition pages 17-19. The witness also drew a distinction between intentionally mispronouncing the word for croch, and called another person a croch. Id. Obviously, whether one is worse then the other is a question of fact for the jury. Also, Alma Toro clearly stated that Carl Field was "always talking dirty." Toro deposition page 17.

BARTINIK, GIANACOPLOS, BARTINIK, BARTINIK & GRATER, P.C.
P.O. BOX 942 • GROTON, CONNECTICUT 06340-0942 • 860-445-8521 • JURIS NUMBER 01220

**The plaintiff has supported her negligent supervison claim**

The plaintiff was a swing manager, and claims to be promised the position of second assistant manager. She has enough authority to have an opinion about whether or not Mr. Michaud had management authority over Mr. Field. Also, the plaintiff can testify about what she was told by Ron Fedor about whether or not Mr. Michaud had management authority over Mr. Field. The statements of Ron Fedor are admissible as statement of a party. FRE 801(d)(2)(D). The plaintiff states that according to Mr. Fedor, Mr. Michaud had the authority to supervise Mr. Field. Plaintiff's affidavit paragraph 13.

The more important issue was not addressed in the defendant's reply brief. Even if this court finds that there is no genuine issue of material fact about whether or not Mr. Michaud had the authority to discipline Mr. Field, then at least he had a duty to report Mr. Field. See plaintiff's brief in opposition to motion for summary judgment page 4.

**The plaintiff has plead a retaliation claim in addition to a hostile environment claim**

Assuming for the sake of argument that his court finds that there is no genuine issue of material fact and the defense is entitled to judgment as a matter of law on the plaintiff's hostile environment claim, then the plaintiff is still entitled to proceed to the jury on her retaliation claim. See Reed v. A.W. Lawrence & Co., 95 F.3rd 1170, 1178 (2d. Cir. 1996). The defense has not addressed the retaliation claim in any of its summary judgment briefs.

BARTINIK, GIANACOPLOS, BARTINIK, BARTINIK & GRATER, P.C.
P.O. BOX 942 • GROTON, CONNECTICUT 06340-0942 • 860-445-8521 • JURIS NUMBER 01220

For the foregoing reasons the defendant's motion for summary judgment should be denied.

THE PLAINTIFF

By____________________

Peter J. Bartinik, Jr. Esq. Ct. 14208
Bartinik, Gianacoplos, Bartinik,
Bartinik & Grater, P.C.
100 Fort Hill Road
Groton, CT 06340
860- 445-8521
860-445-8573 (fax)
Pjb@Grotonlaw.com

**CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed on January 12, 2003 to:

Neal J. McNamara, Esq.
Holland & Knight, LLP
Suite 1800
One Financial Plaza
Providence, Rhode Island 02903

THE PLAINTIFF

By____________________

Peter J. Bartinik, Jr. Esq. Ct. 14208
Bartinik, Gianacoplos, Bartinik,
Bartinik & Grater, P.C.

ıld have been
had he failed

Ins. Co., 66
Rep. 80, was
ıt of a policy
John Ward.
nt of all con-
er set up spe-
nty and false
ary to state-
had met with
he had not
red an illness
ication. The
ore the mak-
iff fully stat-
who took the
ıp in the spe-
ant knew of
ıiums on the
(about a year
d its right to
icy, and was
se allegations
. The plain-
. to introduce
ıd representa-
fendant as to
the applica-
evidence was
was sustained
ıge 239 of 66
ıe trial court
hat, in deter-
of the agent,
ence of coun-
ıption that it
home office.
tions given
d simply that
king into con-
question, but
horitative and
ons to which
" If this be
presumption
e by an agent
e, even in the
l or that the
his principal,
consideration
pany acquired
e information
ld not accord
ed in the oth-
ferred to.
ntiff admitted
ıe policy was

issued and a consequent violation of the policy condition, but alleged that the defendant company knew of the illness when the policy was delivered and the premium was accepted. The answer denied these allegations. On the pleadings, therefore, the issues as to defendant's knowledge, raised by the complaint and answer, were similar, in effect, to those in the Ward Case under the plaintiff's reply and the defendant's rejoinder. Here, as there, evidence of the agent's knowledge "tended, so far as it went, to support" these allegations of the complaint. We note that the defendant in its brief (p. 27) appears to concede that, in this State, parol evidence that an agent had knowledge of facts on which waiver or estoppel is claimed is admissible for the purpose of establishing that such facts were communicated to his principal, citing the Ward and McGurk Cases, but claims that such evidence cannot be admitted "for the purpose of attempting to show that the agent himself waived the conditions of the policy." As to this, it suffices to say that it is clear from the record that the evidence was offered for the purpose first mentioned.

[10] Of the above-mentioned exceptions to the rules imputing to the principal the knowledge of the agent or raising a presumption of communication, that of fraud, collusive or otherwise, between agent and insured, does not appear to be claimed. Also, there is not present, as in the Ward Case, a stipulation in both application and policy that "no information, statements, or representations made or given by or to" the agent "shall be binding on the company, or in any manner affect its rights" unless reduced to writing and presented to the officers of the company. The question whether Dunn was so acting adversely to the interest of the company as to bring into operation the exception applicable in case of such adverse action was, at most, not so clearly settled in the affirmative as to remove it from the domain of the jury. The trial court was not warranted in assuming, as it apparently did, that the circumstance that Dunn would enjoy a large commission if the policy became effective raised such a clear presumption that the agent would not perform his duty to inform his principal of MacKay's illness that the presumption of knowledge of the principal, which otherwise would be raised by his possession of information, could not obtain. See Amer. Law Inst. Restatement, Agency (Tent. Draft No. 5), page 164, comment c. Here, as in Resnik v. Morganstern, supra, as there indicated (page 44 of 100 Conn., 122 A. 910), availability of a presumption of communication of the agent's knowledge depended upon whether the jury found facts sufficient to destroy the presumption that the agent would perform his duty to disclose.

We conclude, therefore, that the elimination from the case of the testimony of Paige as to information possessed by Dunn concerning MacKay's state of health and the exclusion of other evidence to like effect were erroneous, both under the strict rule of imputation or conclusive presumption and under the doctrine of our own cases as above indicated. Therefore, there is no present occasion for determination as to the effect of such conflict as exists between the law of New York and of this state as to the nature and effect of the presumption.

There is error, and a new trial is ordered.

In this opinion, the other Judges concurred.

KEY NUMBER SYSTEM

(118 Conn. 554)

**URSINI v. GOLDMAN.**

Supreme Court of Errors of Connecticut.
June 12, 1934.

**1. Insurance ⚷103**

Insurance broker is agent of insured in negotiating for policy, and owes duty to principal to exercise reasonable skill, care, and diligence in effecting insurance (Gen. St. 1930, § 4126).

**2. Insurance ⚷103**

Any negligence or other breach of duty on part of insurance broker, defeating insurance which he undertook to secure for principal, will render him liable for resulting loss (Gen. St. 1930, § 4126).

**3. Insurance ⚷103**

Insurance broker, undertaking to procure protection against designated risk, has duty to perform obligation with reasonable care, and is liable for loss properly attributable to his default (Gen. St. 1930, § 4126).

**4. Insurance ⚷103**

Where insurance broker does not perform obligation to procure insurance protection against designated risk, constituting breach of duty owing to principal, principal may sue either for breach of contract or in tort for breach of duty (Gen. St. 1930, § 4126).

**5. Trial ⚷250**

In action against insurance broker for damages for not procuring burglary insurance for plaintiff, failure to give separate instructions on alternative causes of action for breach of contract or in tort *held* not error, where complaint and proof were addressed only to cause of action for breach of contract.

**6. Appeal and error ⚷1066**

In action against insurance broker for damages for alleged breach of contract to procure burglary insurance for plaintiff, failure to submit broker's liability on theory of tort, permitting defense of contributory negligence, was not prejudicial, especially in view of charge precluding recovery if plaintiff negligently failed to inform himself of contents of policy.

**7. Contracts ⚷93(2)**

Generally, where mature person who can read and write signs or accepts formal written contract affecting his pecuniary interest, he has duty to read it, and notice of its contents will be imputed to him upon negligent failure to read contract.

**8. Contracts ⚷93(2)**

General rule requiring person to read written contract affecting his pecuniary interest, and imputing notice of its contents if he negligently fails to do so, is subject to qualifications, including intervention of fraud or artifice, or mistake not due to negligence, and applies only if nothing has been said or done to mislead person sought to be charged or to put man of reasonable business prudence off his guard.

**9. Insurance ⚷103**

In action against insurance broker for damages for breach of contract to procure burglary insurance for plaintiff, failure to instruct jury that plaintiff was chargeable, as matter of law, with actual knowledge of contents of burglary policy accepted by him, but which was invalid because of prior burglary, *held* not error, where determination whether plaintiff was chargeable with want of diligence in not informing himself of contents of policy was properly left to jury.

**10. Appeal and error ⚷216(1), 230**

Alleged error in failing to give particular charge to jury *held* not reviewable, in absence of requested charge, or indication in record that particular question was raised or suggested on trial, and question was first advanced in support of motion to set aside verdict.

**11. Insurance ⚷103**

In action against insurance broker for damages for breach of contract to procure burglary insurance for plaintiff, prima facie damage would be amount recoverable under policy procured in accordance with contract.

**12. Insurance ⚷103**

In action against insurance broker for damages for breach of contract to procure burglary insurance for plaintiff, broker has burden to prove that plaintiff suffered no actual damage through broker's breach of duty because particular risk, because of prior burglary, was uninsurable in any reputable insurance company.

---

Appeal from Superior Court, New Haven County; Alfred C. Baldwin, Judge.

Action by William Ursini against Albert Goldman to recover damages for alleged breach of contract by the defendant, an insurance broker, to procure for the plaintiff a policy insuring him against loss by burglary, tried to the jury. Verdict and judgment in favor of the plaintiff, and the defendant appeals.

No error.

Argued before MALTBIE, C. J., and HAINES, HINMAN, BANKS, and AVERY, JJ.

George W. Crawford, and Albert W. Herrmann, both of New Haven, for appellant.

Louis Sperandeo and Louis Feinmark, both of New Haven, for appellee.

HINMAN, Judge.

The plaintiff alleged in general terms in his complaint, and on the trial offered evidence to prove, the following facts: In 1928 he leased a store in a building in New Haven, owned by the defendant, for the purpose of selling groceries at wholesale. The defendant was engaged in the insurance and real estate business, and was a licensed insurance broker. Prior to August, 1928, the defendant repeatedly solicited the plaintiff to insure against burglary, but the plaintiff did not do so. In August the plaintiff's store was entered by burglars, and he sustained substantial loss. The day following the burglary the defendant, knowing that it had occurred, came to the plaintiff's store, stated to him, in substance, "You see, if you had done what I told you to do and taken out burglary insurance, you would be laughing now instead of crying," and urged him to protect himself by insurance against further loss. The plaintiff thereupon told the defendant to obtain for him a policy of $2,000, and the defendant agreed that he would obtain such insurance and secure such protection for the plaintiff.

The plaintiff had no knowledge of or experience with burglary insurance or the terms and conditions thereof, but relied solely upon the defendant's knowledge and experience.

The defendant ordered of local agents of a casualty company burglary insurance of $2,000 for the plaintiff, but failed and neglected to inform them that there had been a previous burglary in the store. The casualty company issued a policy covering the premises against burglary in the sum of $2,000; the policy embodying an application which included a representation that there had been no burglary in the premises for five years. The defendant brought the policy to the plaintiff, who paid the premium by his check to the company, and the defendant received his usual share of this premium. When the defendant brought the policy to the plaintiff's store he told him, in substance, that he was now covered against loss from burglary, and the plaintiff, relying on this assurance and on previous statements to him by the defendant as to his ability to get proper insurance and his knowledge of the insurance business, did not read the policy or the application, but placed the same in a safe, believing that the policy was valid and protected him against loss.

In December, 1928, another burglary occurred in the plaintiff's premises whereby he sustained a loss. He notified the defendant of the burglary, and the latter told him he was protected by the policy and on a number of occasions afterward assured him that the loss would be paid. After some time the insurance company refused to pay the loss and the plaintiff brought a suit against the insurer, which defended, and a verdict in its favor was directed, on the ground of a breach of warranty or representation that the plaintiff had sustained no previous loss by burglary within five years.

The defendant, in the present action, pleaded a general denial, also a special defense alleging in substance that the defendant merely informed the local agents that the plaintiff desired burglary insurance and made no statements or representations to them or the insurer, but that the answers to the questions in the application were made by the plaintiff. He offered evidence that he at no time previous to the issuance of the policy talked with the plaintiff concerning the procurement of it, and had no knowledge of any previous burglary in the plaintiff's store, and had no part in furnishing or procuring the information pertaining thereto; that he made no promises or agreements to procure for the plaintiff insurance against a burglary or to do anything in connection therewith except, as broker, to bring the plaintiff and the insurance agents together; also, that at the time of the delivery of the policy to the plaintiff no statements or representations were made to him by the defendant concerning the terms and conditions.

[1-4] The jury rendered a verdict for the plaintiff, a motion to set it aside was denied, and the defendant on this appeal assigns error in the denial of that motion and in the charge. These assignments involve, in several aspects, the duties and liabilities of an insurance broker. By our statutes "insurance broker" is defined to mean any person who "for compensation, shall act or aid in any manner in negotiating" contracts of insurance, "or in placing risks or soliciting or effecting insurance as agent for a person other than himself, and not as an officer, traveling salaried employee or duly licensed agent of an insurance company or as an insurance solicitor employed by a duly licensed agent." General Statutes, § 4126. This definition is sufficient to our present purposes. Such broker acts as middleman between the insured and the insurer. Having secured an order, he places the insurance, in the absence of a selection by the insured, with the company selected by the broker. 2 Couch, Cyclopedia Ins. Law, § 452; 9 C. J. p. 509. He is the agent of the insured in negotiating for the policy. Mishiloff v. American Central Ins. Co., 102 Conn. 370, 379, 128 A. 33. As such he owes a duty to his principal to exercise reasonable skill, care, and diligence in effecting the insurance, and any negligence or other breach of duty on his part which defeats the insurance which he undertakes to secure will render him liable to his principal for the resulting loss. 2 Couch, § 481; 32 C. J. p. 1088. Where he undertakes to procure a policy affording protection against a designated risk, the law imposes upon him an obligation to perform with reasonable care the duty he has assumed, and he may be held liable for loss properly attributable to his default. The principal may sue either for breach of the contract or in tort for breach of duty imposed by it. Elam v. Smithdeal Realty & Ins. Co., 182 N. C. 599, 602, 109 S. E. 632, 18 A. L. R. 1210, and cases cited in note 18 A. L. R. page 1214.

[5] Asserting that, upon the facts set up in the complaint, the plaintiff could have sought recovery either for breach of contract to procure effective insurance or in tort for negligence in performing the duties imposed

thereby, the appellant contends that the trial court should have given the jury separate instructions appropriate to each of these alternative causes of action. There would be merit in this claim if the complaint had been so framed as to signify dependence on both contract and tort and the case had been tried and submitted to the jury on both of these causes of action, but this was not the case. While it is possible that the averments of the complaint were sufficiently general to admit of a claim for recovery on the ground of negligence, they are specially and significantly adapted to a claim of breach of contract to procure a policy which would protect the plaintiff against loss by burglary. The finding, by which the charge must be tested, shows that the evidence and claims of proof were addressed to that cause of action, and this is confirmed by the evidence, which we have been required to examine under the assignment directed against the verdict. Also, it is plain that the case was submitted to the jury upon that theory only, and not, in addition, in tort for negligence. The charge states the claims of the plaintiff to be: "That the defendant, as a broker and as his agent, contracted with or undertook to procure him a policy of insurance which would protect him against loss from burglary, and that in carrying out this contract the defendant gave false information and failed to give correct information as to the prior burglary which it was his duty to give under his undertaking to procure the policy, and that, as a result, the defendant did not do that which he had contracted to do, and therefore breached his agreement to cause the plaintiff to be insured against loss." The charge as a whole manifestly related to the cause of action so indicated, and is barren of instructions inapplicable thereto, and germane only to a claim in tort founded on negligence.

[6] The appellant's claim of prejudice because of nonsubmission of the tort theory is based upon the principles that while in an action for breach of agreement by a broker to procure insurance, negligence of the plaintiff contributing to the injury sustained by him does not defeat the action but is merely to be considered on the question of damages, in an action founded on tort contributory negligence would have the effect of defeating the action. Elam v. Smithdeal Realty & Ins. Co., supra, page 604 of 182 N. C., 109 S. E. 632; 7 Couch, § 1869. In the present case, the respect in which plaintiff is claimed to have been negligent is in his failure to inform himself as to the contents of the policy, including the misstatements as to prior burglary. It is significant of the scope of the case as tried that the only charge requested by the defendant on this point was to the effect that by such failure the plaintiff is estopped from complaining of, and is to be deemed to have ratified and confirmed, the acts of the defendant in procuring the policy in the form in which it was issued. It is decisive of the appellant's claim of prejudice that the court charged that if the jury found that the plaintiff did neglect his duty in informing himself of the contents of the policy he would be precluded thereby from recovery. The effect so accorded to negligence of the plaintiff, if found, was greater than attached to it in an action for breach of the contract and all that could accrue therefrom in an action founded on tort.

[7-9] Error is assigned in failing to instruct the jury that the plaintiff was chargeable, as a matter of law, with actual knowledge of the contents of the policy accepted by him. The general rule is that where a person of mature years, and who can read and write, signs or accepts a formal written contract affecting his pecuniary interests, it is his duty to read it, and notice of its contents will be imputed to him if he negligently fails to do so; but this rule is subject to qualifications, including intervention of fraud or artifice, or mistake not due to negligence, and applies only if nothing has been said or done to mislead the person sought to be charged or to put a man of reasonable business prudence off his guard in the matter. Elam v. Smithdeal Realty & Ins. Co., supra, page 603 of 182 N. C., 109 S. E. 632; Kornblau v. McDermant, 90 Conn. 624, 629, 98 A. 587; Fidelity & Casualty Co. v. Palmer, 91 Conn. 410, 416, 99 A. 1052; Back v. People's National Fire Ins. Co., 97 Conn. 336, 343, 116 A. 603; West v. Suda, 69 Conn. 60, 36 A. 1015; Floars v. Ætna Life Ins. Co., 144 N. C. 232, 56 S. E. 915, 11 L. R. A. (N. S.) 357; Bostwick v. Mutual Life Ins. Co., 116 Wis. 392, 89 N. W. 538, 92 N. W. 246, 67 L. R. A. 705. In Fries-Breslin Co. v. Bergen (C. C. A.) 176 F. 76, on which the appellant depends, it appears that the defendant brokers merely brought the insured and the insurer into contractual relations, without knowledge of chattel mortgages on the property, and it was held that it did not devolve upon them to inform the plaintiff as to stipulations and conditions included in the policy. It was pointed out, however (page 79 of 176 F.), that if the defendants knew of the chattel mortgages which violated the conditions, and "in the fact of this knowledge" secured new policies containing the mortgage provision avoiding the insurance, they would

be liable. In the instant case one of the main issues contested was whether the defendant knew of the prior burglary, and the verdict imports a finding by the jury that he did. The trial court was correct in leaving to the jury, under instructions which are not directly attacked, determination as to whether the plaintiff, under all the circumstances, was chargeable with such want of diligence in not informing himself as to the contents of the policy as to charge him with knowledge thereof.

The necessity of proof by the plaintiff of reliance upon representations of the defendant that he would procure him protection was repeatedly and sufficiently charged, and the appellant's claim of deficiency in this respect is not sustainable.

[10-12] Error is assigned in the failure to charge that it was for the plaintiff to prove, as an element essential in establishing a loss "as a result of the defendant's alleged breach of his contract of agency," that the plaintiff could have secured a burglary insurance policy that would have indemnified him against loss, notwithstanding the previous loss by burglary. No request was made for a charge upon this point, and there is no indication in the record that it was raised or suggested upon the trial or until it was advanced in support of the motion to set aside the verdict, and we would be justified in declining to take cognizance of it. Stein v. Davidson, 110 Conn. 4, 7, 147 A. 1. However, in a case of this nature, prima facie, the plaintiff's damage would be the amount that could have been recovered under a policy procured in accordance with the defendant's undertaking (7 Couch, § 1869), and it was incumbent on the defendant to show that, notwithstanding the plaintiff suffered no actual damage through defendant's fault in that the risk, because of the prior burglary, was uninsurable in any reputable company. Green v. Bouton, 101 Wash. 454, 172 P. 576; Griffin v. Neelis, 14 La. App. 301, 125 So. 888; 1 Mechem, Agency (2d Ed.) § 1320. This course of procedure was adopted, properly, in MacKay v. Ætna Life Ins. Co., 118 Conn. —, 173 A. 783. These considerations dispose not only of the assignment directed against the charge, but also of the claim, made in support of claimed error in refusing to set aside the verdict, that the plaintiff offered no evidence of procurable indemnity.

The further grounds of attack upon the verdict are that the evidence was not such as to warrant the essential conclusions that the defendant undertook to procure protection for the plaintiff or to do more than to bring about contractual relations between him and the plaintiff relied upon the defendant to procure such protection, and that he was so misled or put off his guard by statements or conduct of the defendant as to relieve him from the ordinary consequences of failure to read his policy. It is enough to say, in addition to the foregoing discussion, that the evidence, either directly or by fair inference, affords to each of these conclusions support sufficient to preclude us from overruling the refusal of the trial court to set aside the verdict.

There is no error.

In this opinion, the other Judges concurred.

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

MELISSA BURFORD, Plaintiff,

vs. : C.A. No. 3:02-CV-1738 DJS

McDONALD'S CORPORATION, Defendant.

DEPOSITION of MELISSA BURFORD, the Plaintiff in the above-entitled cause, taken on behalf of the Defendant before Melanie M. Chace, RPR, Notary Public, in and for the State of Rhode Island, at the offices of Holland & Knight, LLP, One Financial Plaza, Suite 1800, Providence, Rhode Island on June 27, 2003 at 10:00 a.m.

PRESENT:

FOR THE PLAINTIFF: ...... BARTINIK, GIANACOPLOS, BARTINIK, BARTINIK & GRATER, P.C.
100 FORT HILL ROAD
GROTON, CONNECTICUT 06340-0942
BY: PETER J. BARTINIK, JR., ESQUIRE

FOR THE DEFENDANT: ...... HOLLAND & KNIGHT, LLP
BY: NEAL J. McNAMARA, ESQUIRE
DAMON P. HART, ESQUIRE

ALSO PRESENT: RON FEDOR

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500

Page 98

A. Five, I believe it was five times.
Q. Including July 17, that last day?
A. Yes.
Q. What else did Mr. Field do between the time you agreed to stay and the time that Tim came back?
A. I know when I would come in for managers' meetings, I would -- I felt that you should dress up for manager meetings, you shouldn't come in like in blue jeans and T-shirt. I would wear sweaters that would button up, nice shirts. He would make comments that he would want to look down my shirt.
Q. How many times did he do that?
A. Quite a few.
Q. What else did he do during that period of time?
A. He'd done so much stuff to me. I'm not sure. I think that's pretty much everything that he was doing, was the touching, the rude comments.
Q. Then Tim came back?
A. Yes.
Q. What happened when Tim came back?
A. I sat down with Tim and he had -- they have two big round corner booths. So he took me over to the one corner booth and sat me down and asked me what was going on. I proceeded to tell him everything that had

Page 99

happened. And he pretty much come out and told me that I was full of shit, that I was lying, that none of this ever happened.
Q. Did he say why he didn't believe you?
A. I found out later that him and, I guess him and Carl had been friends and he was taking Carl's side. Carl was saying that nothing happened, that I was just lying about everything.
Q. How did you find that out later that they were friends?
A. Through some of the crew members.
Q. Who told you that?
A. I believe Louise told me that they were friends, I believe she was one of them. And they had both worked at McDonald's Corporation for so many years, they had worked together before.
Q. They had worked in the same store before?
A. From what I understand, yes.
Q. Who do you understand that from?
A. Just from people talking in the store.
Q. They never told you that themselves?
A. No.
Q. Did Carl do anything that bothered you after Tim returned?

Page 100

A. Yes.
Q. What did he do?
A. Him and Tim would make jokes about me.
Q. What kind of jokes?
A. We were at a managers' meeting, this was after I'd already had put in two-week notice for the week off of July 4th. My family was coming out, I hadn't seen them in two years. Tim told me I couldn't have it, the week off, he said I wasn't eligible for the vacation. I said, I don't care if I got paid for it, I just wanted the week off because my family was coming out. He told me I couldn't have it. So at the managers' meeting, this was after the 4th, the 4th had already passed, Louise was up for her week vacation, not that week, but the next week she was taking her paid vacation. And both Tim and Carl, they're like whispering to each other, then Tim says to Louise, 'You know, I'm going to take your paid vacation from you, too, you can't take next week off either, you're going to have to work.' Then they would both start snickering and laughing at me. Then Carl went to make a sexual comment, he started to say and he said, 'Oops, I can't do that, that's sexual harassment.'
Q. What did he start to say?

Page 101

A. He was making a comment about a woman that was walking, one of the female customers, something about her body, I'm not sure exactly what it was now, but it was something about her body. That's when he said, 'I can't do, that's sexual harassment.' I know that upset Vern and some of the other managers because most of the managers were looking at them like, this isn't appropriate. They knew they were all making fun of me.
Q. How was Carl making fun of you by saying that?
A. The sexual harassment, because I had already complained about the sexual harassment. He would walk past me and be like, 'I can't do that, you'll accuse me of sexual harassment again.' Things like that. They made it very uncomfortable to work there.
Q. You did take time off in July, didn't you?
A. Yes, for a family funeral. I went back home, my brother-in-law had drowned.
Q. Was there anything that Carl did after Tim returned?
A. Just those rude comments. They were not very friendly to me. I don't know, they made me feel not welcome. If I would make one mistake they were very hard on me. It was stuff like that.
Q. Can you give me an example?

Page 102

A. I know Tim had taken me out to the corral where the garbage is and brought up about the second assistant manager's job. And he said, 'You know you have to have flexible hours for that.' I said, 'Yes, I'm in the process of getting my daycare so I can have somebody to take care of my child so I can have this job.' And he's like, 'Okay.' Then I find out that a kid that had only been with the company for three weeks, they gave him the position.. So I just, the one day I asked him, I asked the kid before I left, I said, 'Who gave you second assistant manager's job?' They had already told me that was my job. And that is when he told me that both Carl and Tim had given him the position and there was when I heard that. So I left. As soon as I left, that Timmy, he starts saying to Stacey laughing, saying, 'Ha, ha, ha, yeah, I took her job,' and stuff like that. When I got in the next day, I was doing my job as normal, and Timmy come in, was very rude to me, told me he was taking the shift over. And I'm like, according to the schedule, when you see on the schedule, it tells you who is running the shift. If it has F for that manager that person is to run the floor, and that's what it had. He said, 'No, I'm supposed to run it.'

Page 103

So, I didn't even see Tim Michaud come in that morning, I didn't even know that he had come in. I was back in the office taking care of a drawer, I was counting down a drawer from somebody that had gone on break. I put that in the safe and Tim said, 'I need to speak to you.' We walked over to the one corner booth and was going to sit there, he said, 'We're not going to do that here,' he said, 'Come outside.' He started screaming at me, he said I had no right to ask Timmy who give him the job, that was none of my business. That he was tired of my crap, that I was causing too much trouble in the store, and he told me to go home. And I said, 'Okay.' I said, 'That's really what you want me to do?' I said, 'I'm calling Ron Fedor.' And I called Ron and told Ron that Tim was sending me home and I no longer could work in the store then.

Q. When you say Tim, is that Tim Meredith?

A. Yes, I believe that was what his last name was.

Q. Did you know him before he came to work at McDonald's?

A. No.

Q. Did you know that he had been a manager at the Burger King across the street?

A. He wasn't a manager over there, he was a crew

Page 104

person, he did tell me that. He was in the process of possibly becoming a manager over there, is what he told everybody in the store.

Q. How old was he?

A. Maybe 19, 20 years old.

Q. He became a second assistant like --

A. Without even becoming a swing manager or anything. They handed him the job.

Q. And Vern was also second assistant?

A. Yes.

Q. Were there any other second assistants?

A. Louise was in the second, she was in the process of becoming a first, she was going to school for that.

Q. She was not a first assistant yet?

A. No.

Q. You said you had had a conversation with Carl about being second assistant back in May?

A. Yes.

Q. Then you checked into daycare?

A. Yes.

Q. Had another conversation with Carl?

A. Yes.

Q. That after that other conversation with Carl did you ever have another conversation with him about being a

Page 105

second assistant?

A. I think so, because he had put me in charge of front counter. I was in charge of POP, and him and Tim both had given me more keys. I had keys to control, to open everything in the store. Those keys only second assistant, first assistant and store managers had keys for them. They also bought me, they bought the shoes for the workers so you don't slip and fall in the store. The crew members wore different shoes than the assistant managers did. They also bought me a pair of the nicer shoes for second assistant. I have them shoes. They're still brand new, still in the box.

Q. Do you mean that second assistant managers --

A. They're more dressier shoes.

Q. Let's go back to the keys for a minute. As a swing manager you open the store?

A. Right.

Q. You're saying that a second assistant has access to keys that open more things than a swing manager does?

A. Right.

Q. Even though the swing manager opens the door?

A. Right. All I had keys to was to open the front door, to open the registers, that was it. They had

COPY

UNITED STATES DISTRICT COURT
DISTRICT COURT OF CONNECTICUT

MELISSA BURFORD )CIVIL NO: 3:02 CV 1738(DJS)

vs.

McDONALD'S CORPORATION )JULY 8, 2003

**DEPOSITION OF ALMA TORO**

**A P P E A R A N C E S**

For the Plaintiff:

Peter J. Bartinik, Jr., Esq.
Bartinik, Gianacoplos, Bartinik
Bartinik & Grater, P.C.
100 Fort Hill Rd.
Groton, CT 06340

For the Defendant:

Neal J. McNamara, Esq.
Damon P. Hart, Esq.
Holland & Knight, LLP
Suite 1800
One Financial Plaza
Providence, RI 02903

Jennifer Vernon, LSR
Shea & Driscoll, LLC
16 Seabreeze Drive
Waterford, Connecticut 06385

with Melissa Burford?

A. Well, he didn't say want. He was. He was. I mean, he was always saying nasty words which -- not to me, thank, God.

Q. Are there things that Carl Fields said that were inappropriate that I haven't asked you about?

A. Well, he was always talking dirty like in -- like bed in a position that he would like to do or if he could catch that girl what would he do with her, stuff that we -- I wouldn't like to hear as a woman.

Q. How often would he make comments like this?

A. That was often. That was all the time which there was a -- he knew a word which there was lettuce in Spanish is latuga, you know. It's latuga. He would say, oh, that's the latuga, chocha, which is a bad word in Spanish which it means your crotch, your private, and he knew that because there was a lot of Spanish speaking working there, and he was always kidding around with that.

Q. So it was your belief he intentionally mixed up the word to make a comment?

A. Yes.

Q. Why is it you think he intentionally mixed the word up, and he just didn't make an honest mistake?

A. Because he knew there was a lot of Spanish speaking there, and he wanted to learn Spanish, and he knew what

words -- they were teaching him how to say the words and everything and he knew and the bad words too. He knew what they meant.

Q. Aside from Spanish words that were -- that closely resembled other Spanish words for food products, were there -- did he know other Spanish bad words --

A. Yes.

Q. -- that were in no way related to food or anything like that?

A. No. Like, bad words he knew how to say puta which is bitch in English and other words that are Spanish that are very bad words. He knew them. He knew they were bad, and he knew what it meant.

Q. You heard him say these other bad words in Spanish?

A. Well, never heard him say it, but when they were teaching him, yes, like all the guys be around him in back and teach him how to say, you know, bad words or touch this tomata, all this stuff because he wanted to learn how to speak Spanish.

Q. I'm talking about the bad words in Spanish.

A. Yeah.

Q. You're saying that you never heard Carl Fields --

A. Well, when they were teaching him, yes, but not if coming to me and saying you puta or capon or not specifically, just I heard him say practicing, like teaching

how to say the words.

Q. So the Spanish guys in the store --

A. Yeah.

Q. -- taught Carl Fields how to say the bad words in Spanish?

A. Uh-huh.

Q. And you heard Carl Fields say those words in the context of that teaching?

A. Teaching.

Q. But not -- in the context of that teaching of the bad words, you didn't really hear him say those bad words?

A. Not specific to a person, no. Just him practicing how to say the words. I don't think that would be, like, bad because he's not specifically telling somebody the word.

Q. Can you just list out the different words that you heard Carl fields say like in Spanish say them out loud?

A. Let's see, puta, capon, latuga, tomata, and some other words which I can't remember, but they were bad words, sucio, and I don't think that was very bad because he wasn't saying it to anybody. He was just practicing.

Q. To your knowledge was Melissa Burford ever promoted to second assistant manager?

A. Yes, she was.

Q. Why do you think Melissa Burford was promoted to second assistant manager?